UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| NATIONWIDE DAIRY INC., | |
| Plaintiffs, | **Index No.** |
| -against- | **VERIFIED COMPLAINT** |
| FRESH DAIRY INC., SLAM ZAMANOV and LAKEVIEW FARMS, LLC, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff, Nationwide Dairy Inc., by and through its undersigned counsel, Mestechkin Law Group P.C., as and for its Complaint against Defendants Fresh Dairy Inc., Slam Zamanov, and Lakeview Farms, LLC hereby alleges as follows:

## NATURE OF ACTION

1.      This is an action by Plaintiff Nationwide Dairy Inc. ("Nationwide") against Defendants Fresh Dairy Inc. ("Fresh Dairy"), Slam Zamanov ("Zamanov"), and Lakeview Farms, LLC ("Lakeview") for (1) false designation of origin under 15 U.S.C. § 1125, (2) unfair competition under New York law; and (3) tortious interference under New York law, arising from Defendants' copying of certain registered United States trademarks (of which Plaintiff is the exclusive licensee) and then applying those trademarks on the same dairy goods as Plaintiff and selling those goods in the exact same grocery stores, supermarkets and internet stores as Plaintiff.

2.      Plaintiff prays for an order, *inter alia*, (1) permanently enjoining Defendants from selling dairy products branded with Plaintiff's trademarks, or colorable imitations thereof, (2) permanently enjoining Defendants from making false statements about Plaintiff's business or its products, (3) given the deliberate nature of Defendants' misconduct, awarding Plaintiff treble damages in an amount equal to triple the amount of Defendants' profits, (4) awarding Plaintiff

1

the costs of bringing this action due to Defendants' failure to comply with Plaintiff's reasonable demands made prior to this action, and (5) for such other and further relief as is just and proper.

## PARTIES

3. Plaintiff Nationwide Dairy Inc. is a citizen of New York because it is a New York corporation with a principal place of business at 792 E 93rd St, Brooklyn, New York 11236.

4. Defendant Fresh Dairy Inc. is a citizen of Pennsylvania because it has a principal place of business at 13451 Damar Drive, Unit C, Philadelphia, Pennsylvania 19116.

5. Defendant Slam Zamanov is a citizen of Pennsylvania because he has a residence at 611 Sweetwater Drive, Feasterville, Pennsylvania 19053.

6. Defendant Lakeview Farms LLC is a citizen of Delaware and Ohio since it is a Delaware LLC with a principal place of business at 1600 Gressel Dr., Delphos, OH 45833.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. § 1121 (Trademark Act of the United States), 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1338 (patent, trademark and copyright) and 28 U.S.C. § 1367 (supplemental jurisdiction).

8. This Court has personal jurisdiction over Defendants under New York Civil Practice Law and Rules § 302 because (1) Defendants market, sell, offer to sell and ship their infringing products to residents of New York through supermarkets and grocery stores located in New York, and (2) certain Defendants interfered with Plaintiffs' business by making false statements to retailers about Plaintiffs' business while those Defendants were in New York.

9. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 for the same reasons that personal jurisdiction over Defendants in New York is proper and because Plaintiff is a citizen of this judicial district, Defendants transact substantial business in this district, and a

substantial part of the events giving rise to the claims herein occurred in this district.

## STATEMENT OF FACTS

I.   **PLAINTIFF'S RENOWNED DAIRY PRODUCTS BUSINESS**

10.   Since 2009, Plaintiff has been producing and distributing a wide variety of dairy products under the brand name, "Biolife", to retail grocery stores and supermarkets throughout the United States, including Pennsylvania, New York, and New Jersey.

11.   Plaintiff produces and distributes dairy products that are especially marketed to Russian-American communities throughout the United States, such as kefir, a kind of fermented milk drink, sour cream, and a variety of farmers cheeses.

12.   Many of Plaintiff's dairy products are rich in Protein, Calcium, Phosphorus, Vitamin B12, Riboflavin (Vitamin B2), Magnesium and Vitamin D.

13.   Still others of Plaintiff's products, such as Plaintiff's probiotic kefir and yogurt drinks, have outstanding nutritional and health benefits, such as the prevention of diseases and conditions like constipation, diarrhea, irritable bowel syndrome, ulcerative colitis, Crohn's disease, urinary tract infections, helicobacter pylori (the cause of ulcers), pouchitis (affecting the colon), re-occurrence of cancer of the bladder, infection of the digestive tract by clostridium difficile and eczema in children.

14.   In the course of over a decade, Plaintiff has invested hundreds of thousands of dollars in research and development in producing dairy products of superior health and nutritional characteristics using high quality ingredients, most effective organic probiotic bacteria cultures, and exhaustive quality control measures based on proprietary methods, as well as investing in and using state-of-the art equipment.

15.   For example, Plaintiff's kefir probiotic drinks are produced by first preparing a

mother culture of raw milk preparation, to which yeast and beneficial lactic acid bacteria are then added to initiate the process of fermentation and addition of probiotics.

16.     The raw milk used by Plaintiff is fresh organic milk sourced from a few select farms with whom Plaintiff has been working for over two decades, while the selection of yeast and probiotic bacteria stock also comes from no more than a handful of proprietors.

17.     The preparation of the mother culture begins with the clarification, separation, standardization, deaeration and pasteurization of raw milk, utilizing a special thermal treatment.

18.     Although the fermentation process typically takes about 14-16 hours, Plaintiff ferments its kefir drinks for a full 24 hours to ensure maximum uptake of probiotics.

19.     Therefore, because the final drink product is the result of a number of ingredients and a multitude of inter-dependent steps, any change in the quality of the ingredients, and/or any compromise in the steps to produce the kefir drink could result in drastic changes to the quality and/or taste of the product.

20.     Plaintiff has been mastering the taste and quality of their products for more than a decade by constantly improving the source of its ingredients, refining its recipes, upgrading its equipment, and listening to the feedback of its retail and end-user customers.

21.     Since their debut, Plaintiff's products have garnered widespread acclaim for their taste and quality, which are typified by these posts on Nationwide's Facebook page:



## II. **THE ASSERTED TRADEMARKS**

22.     Plaintiff was the original registrant of U.S. Trademark No. 4,198,589 (the "'589 Mark") and the original applicant for U.S. Trademark No. 6,236,837 (the "'837 Mark"). True and correct copies of the Registrations are attached as Exhibit A.

23.     On March 16, 2020, Plaintiff assigned all rights and title to the '837 Mark and the '589 Mark to a company called Bio Brands Inc. of Brooklyn, New York. A true and correct copy of the assignment of these trademarks to Bio Brands Inc. is attached as Exhibit B.

24.     In consideration for the assignment, Bio Brands granted Plaintiff an exclusive license. A true and correct redacted copy of the exclusive license agreement between Plaintiff and the licensor, Bio Brands, Inc. is attached as Exhibit C.

| U.S. No. 6,236,837 | U.S. No. 4,198,589 |
|---|---|
|  | ИЗРАИЛСКИЙ ISRAELSKY |

25.     Plaintiff has been constantly using the '589 Mark since 2003 and the '837 Mark since 2010 to sell dairy products to consumers nationwide, which use was not interrupted by its assignment of rights to those Marks to Bio Brands because Plaintiff received an immediate exclusive license as part of the assignment.

26.     The following are samples of dairy products branded with Plaintiff's trademarks that have been sold and marketed to consumers under Plaintiff's BIOLIFE brand.





27.     The '589 Mark is distinctive because it has been registered and has been in continuous use for over five years. (*See* Ex. A.)

28.     The '837 Mark is inherently distinctive as whimsical and arbitrary because it is comprised of an animated character.

29.     Both trademarks are distinctive also because (other than Defendants' infringing trademarks) no other producers or distributors of dairy products use Nationwide's trademarks.

30.     For example, on the specialty food websites, Primefoodsmarket.com and Storenearus.com, the only kefir products using the '589 Mark (*i.e.*, the word "Israelsky") are those sold by Plaintiff and Defendants. A true and correct copy of the search results for "kefir" on the Primefoodsmarket.com website as accessed on June 26, 2021 is attached as Exhibit D. A true and correct copy of the search results for "kefir" on the Storenearus.com website as accessed on June 26, 2021 is attached as Exhibit E.

31.     Similarly, on those same sites, the only kefir products using the '837 Mark (*i.e.*, the image of the Amish farmer) are those sold by Plaintiff and Defendants. *See* Exs. D & E.

32.     Moreover, on the Storenearus.com website as accessed on June 26, 2021, there are no sellers or producers of sour cream (Exhibit F) or farmers cheese (Exhibit G) that utilize either of Plaintiff's trademarks.

33.     Thus, based on the lack of use of these trademarks by any other sellers or producers of dairy products, Plaintiff's trademarks are highly distinctive.

## III.   DEFENDANTS' INFRINGEMENT AND TORTIOUS INTERFERENCE

34.     Beginning in 2018, Defendants Slam Zamanov and Fresh Dairy Inc. ("Fresh Dairy"), contacted Plaintiff with an offer to become Plaintiff's distributor of dairy products produced by Plaintiff, which were branded with Plaintiff's '589 and '837 trademarks.

35.     As part of his agreement with Plaintiff, Mr. Zamanov would drive his delivery truck to Plaintiff's facility, take possession of Plaintiff's dairy goods, and then deliver those goods to grocery stores and supermarkets throughout New York, New Jersey and Pennsylvania.

36.     From the start, Defendants observed first-hand the popularity of Plaintiff's products and Plaintiff's trademarks, so much so that Defendants decided to capitalize on that popularity by themselves selling many of the same products to the same supermarkets and grocery stores as Plaintiff.

37.     Instead of competing honestly however, Defendants sought to cut corners, to the detriment of Plaintiff and all of Plaintiff's customers and end-consumers.

38.     Defendants Zamanov and Fresh Dairy first contracted with a label-printing company to help create product labels that are closely similar to Plaintiff's product labels, including using Plaintiff's trademarks.

39.     Then, Defendants Zamanov and Fresh Dairy engaged producers of dairy products, like Defendant Lakeview Farms (with whom Defendants have worked with since August 2017),

to supply Defendants Zamanov and Fresh Dairy with dairy products with packaging prominently featuring Plaintiff's U.S. registered trademarks, with the intent to distribute infringing and counterfeit dairy products of inferior quality to the same retailers to which Defendants Zamanov and Fresh Dairy were previously contracted to distribute Plaintiff's original dairy products.

40.    Defendants then, beginning in 2021, visited numerous Russian-American ethnic supermarket and grocery stores from Pennsylvania to New York and made numerous, patently false statements to the owners of those stores that Plaintiff's business was shuttered due to Covid in order to trick those stores into replacing Plaintiff's goods with Defendants' goods. These statements were effective because Defendants used to distribute goods for Plaintiff.

41.    As was told to Plaintiff by those store owners, Defendants were successful in their scheme because many of these store owners were convinced to sell the infringing goods, after which Mr. Zamanov would personally deliver infringing goods with his delivery truck to those stores located in New York, New Jersey and Pennsylvania.

42.    After hearing these reports from his customers, Plaintiff paid visits to some of these stores to determine which stores were selling Defendants' infringing dairy products.

43.    To Plaintiff's dismay, Plaintiff discovered numerous infringing goods sold by Defendants on the same store shelves as Plaintiff's goods, stores such as "Sheepshead Bay Marketplace" of 1717 Avenue Z, Brooklyn, New York 11235, "Golden Key" of 1067 Brighton Beach Ave, Brooklyn, New York 11235, "Arkadia" of 1079 Brighton Beach Ave, Brooklyn, New York 11235, "Brighton Bazaar" of 1007 Brighton Beach Ave, Brooklyn, New York 11235, "King Meat" of 1007 Brighton Beach Ave, Brooklyn, New York 11235, "Big Bazaar Supermarket" of 128 Brighton Beach Ave, Brooklyn, New York 11235, "Netcost" of 3100 Ocean Ave, Brooklyn, New York 11235, "Netcost" of 2257 East 16th Street, Brooklyn, New

York 11229, "Netcost" of 1029 Brighton Beach Ave, Brooklyn, New York 11235, "Netcost" of

532 Neptune Ave, Brooklyn, New York 11224, "Netcost" of 2339 65th St, Brooklyn, New York

11204, "Netcost" of 8671 18th Ave, Brooklyn, New York 11214, "Netcost" of 3155 Amboy Rd,

Staten Island, New York 10306, "Netcost" of 97-10 Queens Blvd, Queens, New York 11374,

Ester Deli of 3660-3664 Nostrand Ave., Brooklyn, New York 11229, Bells Market of 8330

Bustleton Ave, Philadelphia, Pennsylvania 19152, and Bells Market II of 1055 Bustleton Pike,

Feasterville-Trevose, Pennsylvania 19053.

44.     Plaintiff did not give Defendants any permission to use the asserted trademarks on

their products.

45.     Plaintiff's owner, Eduard Magidov, took photographs of the infringing goods

from the store shelves of various stores in New York, including "Golden Key" of 1067 Brighton

Beach Ave, Brooklyn, New York 11235, "Arkadia" of 1079 Brighton Beach Ave, Brooklyn,

New York 11235, and "Brighton Bazaar" of 1007 Brighton Beach Ave, Brooklyn, New York

11235. Those photos are displayed at paragraphs 48 and 49 of this complaint alongside

Plaintiff's trademarked-products.

46.     Plaintiff also discovered that Defendants were offering their products for sale to

consumers in New York through interactive websites such as Primefoodsmarket.com and

Storenearus.com, on which Plaintiff is also offering its products.

47.     What was most shocking however was that Defendants' products displayed

packaging and trademarks that were strikingly similar to Plaintiff's trademarks, intended

obviously to capitalize on the reputation of Plaintiff and its products.

48.     Depicted below are images comparing Plaintiff's goods displaying the '837 Mark

and Defendants' goods displaying infringing copies of that mark.

| Plaintiff's Goods Branded by '837 Mark | Defendants' Infringing Goods |
|---|---|



49.     Depicted below are images comparing Plaintiff's goods displaying the '589 Mark and Defendants' goods displaying infringing copies of that mark.

| Plaintiff's Goods Branded by '589 Mark | Defendants' Infringing Goods |
|---|---|



50.    The similarity of the marks used by Plaintiff and Defendants is striking and can be measured in several ways.

51.    First, for the '589 Mark (*i.e.*, the word mark for "Israelsky"), both goods use the word "Israelsky" in blue, all-caps lettering, situated near an image of the Israeli Flag, featuring the Star of David.

52.    Although Defendants add some slight design elements to try and differentiate its label from Plaintiff's, such as adding its company name and the image of a menorah, these changes are inconsequential because compared to other similar goods in the market place, no other seller uses the name "Israelsky" in blue, all-caps lettering, near an image of the Israeli Flag,

featuring the Star of David. *See* Exs. D and E.

53.     Similarly, for the '837 Trademark (*i.e.*, the logo of the Amish farmer), both Plaintiff's goods and Defendants' goods use an image of the head of a red-bearded Amish farmer with a large white Amish hat.

54.     Although Defendants add some slight design elements to try and differentiate this trademark from Plaintiff's trademark, such as making the individual more realistic, these changes are inconsequential because compared to other similar goods in the market place, no other seller uses the image of the head of a red-bearded Amish farmer with a large white Amish hat. *See* Exs. D and E.

55.     Thus, a consumer could easily assume that Plaintiff's goods and Defendants' goods come from the same supplier or producer.

## IV.     IMPACT OF DEFENDANTS' INFRINGEMENT AND TORTIOUS CONDUCT

56.     The existence of these infringing products explained the alarming reduction in Plaintiff's sales of its products branded with the asserted trademarks, which had suffered significantly since Defendants first started selling their infringing dairy products.

57.     For example, whereas Plaintiff sold $14,520.80 worth of dairy products to Bells Market of Pennsylvania from January 1, 2020 to June 18 of 2020, Plaintiff has only sold $6,743.87 worth of dairy products for the same period this year from January 1, 2021 to June 18, 2021 – a loss of $7,776.93, or 54% in revenue.

58.     Similarly, whereas Plaintiff sold $9,730.12 worth of dairy products to Brighton Bazaar of Brooklyn from January 1, 2020 to June 18 of 2020, Plaintiff has only sold $6,711.86 worth of dairy products for the same period this year from January 1, 2021 to June 18, 2021 – a loss of $3,018.26, or 31% in revenue.

59.     Similarly, whereas Plaintiff sold $12,588.69 worth of dairy products to Golden Key of Brooklyn from January 1, 2020 to June 18 of 2020, Plaintiff has only sold $8,109.60 worth of dairy products for the same period this year from January 1, 2021 to June 18, 2021 – a loss of $4,479.09, or 35% in revenue.

| Store | Revenue (1/1/20-6/18/21) | Revenue (1/1/21-6/18/21) | Δ Revenue Dollars | Δ Revenue % |
|---|---|---|---|---|
| Bells Market | $14,520.80 | $6,743.87 | –$7,776.93 | –54% |
| Brighton Bazaar | $9,730.12 | $6,711.86 | –$3,018.26 | –31% |
| Golden Key | $12,588.69 | $8,109.60 | –$4,479.09 | –35% |

60.     Further, this harm to Plaintiff's sales continues today, and will continue to accumulate, since by the nature of the dairy industry which involves the sale perishable goods, a supplier can only deliver a weekly supply, and must deliver fresh inventory every week.

61.     Based on weekly inspections by Plaintiff's owner, Eduard Magidov, of many of the local supermarkets in Brooklyn, New York, identified in paragraph 43 above, Plaintiff discovered that Defendants have been making weekly deliveries of infringing sales ever since Plaintiff discovered the initial infringing sales in early 2021.

62.     Further, this reduction in sales was not the only the harm resulting from merchants who still continued to do business with Plaintiff.

63.     As Plaintiff's owner, Eduard Magidov, discovered, many retailers were tricked into stocking the entire shelf space that was previously occupied by the Plaintiff's dairy goods with Defendants' infringing goods based on Defendants' false assertions about Plaintiff's business being shuttered due to Covid and no longer being in business.

64.     These stores included "Golden Key" of 1067 Brighton Beach Ave, Brooklyn, New York 11235, "Arkadia" of 1079 Brighton Beach Ave, Brooklyn, New York 11235, "Brighton Bazaar" of 1007 Brighton Beach Ave, Brooklyn, New York 11235 and "Big Bazaar

14

Supermarket" of 128 Brighton Beach Avenue, Brooklyn NY 11235.

65.     These are only the stores with whom Plaintiff has spoken since discovering Defendants' conduct earlier this year. Many other stores with whom Plaintiff has done business in the past suddenly stopped placing orders with Plaintiff in 2021, leading Plaintiff to suspect that these retailers were also deceived into buying Defendants' products due to Defendants' false statements at the expense of Plaintiff's products.

66.     But this devastating impact on Plaintiff's revenues and buying customers is not even remotely the worst consequence of Defendants' actions.

67.     When Mr. Magidov went to inspect Defendants' products, he discovered some obvious differences in the quality of Defendants' products that made them markedly inferior to Plaintiff's products and that threatened to harm the reputation that Plaintiff worked so hard to develop.

68.     Whereas Nationwide's sour cream products use two simple ingredients, *i.e.*, all natural fresh cream and all natural cultures, Defendants' sour cream products use an astounding list of ten (10) ingredients and/or chemicals, that no doubt results in products that are markedly different, in smell, taste, and texture and that are inferior to those of Nationwide's products.

| Ingredients for Nationwide's Sour Cream | Ingredients for Defendants' Sour Cream |
| --- | --- |
| (1) Natural Fresh Cream, (2) All Natural Cultures | (1) Cultured Cream, (2) Modified Corn Starch, (3) Lactic Acid, (4) Gelatin, (5) Mono and Diglycerides, (6) Citric Acid, (7) Potassium Sorbate (a preservative), (8) Disodium Phosphate, (9) Locust Bean Gum, (10) Added Flavors |

69.     Because natural fresh cream has a limited shelf life, the production costs involved in using natural fresh cream as the main ingredient for sour cream with no added preservatives is necessarily more expensive than using cultured cream with a slew of preservatives added to keep

the cream from going bad.

70.     The benefits of using fresh cream, however, is that despite the added costs, the products undoubtedly taste better and are healthier because there are no harmful chemicals added, which the consumers are ingesting into their bodies.

71.     Moreover, Plaintiff has throughout its decade of existence attempted to associate the asserted trademarks and its brand with all-natural ingredients by selling only products with all natural ingredients.

72.     Customers who purchase Defendants' infringing products, thinking that those products originate from Plaintiff, will now come to believe that Plaintiff's products are not all natural because of the ingredient list of mostly non-natural ingredients and/or chemicals – with the effect being that Plaintiff's brand of a being a provider of all natural dairy products will necessarily be harmed.

## V.      PLAINTIFF'S ATTEMPTS TO STOP DEFENDANTS' INFRINGEMENT

73.     Upon discovering these infringing products and Defendants' outrageous conduct, Plaintiff on May 19, 2021 sent a cease and desist letter to Defendants, asking that Defendants, *inter alia*, stop all infringing sales, stop all disparaging statements, remove all infringing products from store shelves, and provide an accounting of all infringing sales in order for Plaintiff to determine their illicit profits. A true and correct copy of the Plaintiff's cease and desist letter is attached hereto to Exhibit H.

74.     To date, Defendants have not responded in any way, to Plaintiff's reasonable requests, thereby forcing Plaintiff to commence the instant action and accompanying motion.

75.     Defendants' actions have caused and will continue to cause Plaintiff significant harm to its business and reputation while simultaneously unjustly enriching Defendants by the

false association created by their infringing use of Plaintiff's trademarks.

76. Individual Defendant Slam Zamanov is the sole owner of Defendant Fresh Dairy Inc. and is directly involved with and authorized the unauthorized activities described herein.

77. Mr. Zamanov was aware of the infringing activity and continued personally and to permit his company, Defendant Fresh Dairy Inc., to distribute infringing dairy products and Mr. Zamanov has a financial interest in and the right and ability to control the action of Fresh Dairy Inc. Therefore, Mr. Zamanov is directly, contributorily, and/or vicariously liable for the infringement of Plaintiff's trademarks.

**FIRST COUNT FOR RELIEF**
**(False Designation of Origin Under 15 U.S.C. § 1125(a))**

78. Plaintiffs repeat and reallege each of the allegations of the foregoing paragraphs as if fully set forth herein.

79. Nationwide is the exclusive licensee of the '837 Mark and the '589 Mark.

80. The asserted trademarks are prima facie valid because they have been registered with the United States Patent and Trademark Office.

81. Defendants have used trademarks which are confusingly similar to the asserted trademarks to market, sell and offer to sell dairy products to the same retailers throughout the United States, including New York, to whom Plaintiff regularly markets, sells and offers to sell dairy products labeled with the asserted trademarks.

82. Plaintiff has not consented to Defendants' use of the asserted trademarks.

83. Defendants' use of the asserted trademarks in connection with Defendants' dairy products is likely to cause and is causing confusion, mistake and deception among the general public as to the relationship and/or sponsorship of Defendants' dairy products, and is likely to deceive the public into believing that the products offered and supplied by Defendants originates

17

from, are associated with, are related to, or are otherwise authorized by Nationwide, all to the damage and detriment of Plaintiff.

84.     As a result of Defendants' actions, Plaintiff is losing profits from lost sales, suffering a loss of enormous goodwill, and will continue to suffer such loss if Defendants are allowed to continue their illegal activity.

85.     Defendants have knowingly and willfully engaged in their illicit activities in direct violation of Plaintiff's rights and/or have shown a blatant disregard for the same.

86.     As a result of Defendants' conduct, Plaintiff is entitled to damages in an amount equal to three (3) times Nationwide's damages and/or Defendants' profits; and (b) reasonable attorneys' fees, investigative fees, and pre-judgment interest pursuant to 15 U.S.C. § 1117.

87.     In addition, Plaintiff has no adequate remedy at law for Defendants' ongoing wrongful conduct. Plaintiff has been, and absent injunctive relief will continue to be, irreparably harmed by Defendants' actions.

88.     Unless Defendants' unlawful actions as alleged herein are immediately enjoined, Defendants will continue to cause damage to Plaintiff and its trademarks and Plaintiff will continue to suffer irreparable harm and injury.

## SECOND COUNT FOR RELIEF
### (Unfair Competition Under New York Law)

89.     Plaintiff repeats and realleges each of the allegations of the foregoing paragraphs as if fully set forth herein.

90.     Defendants have misappropriated the labors and expenditures of Plaintiff in the manner described above, including but not limited to, infringing Plaintiff's trademarks and profiting from the goodwill that Plaintiff spent decades developing, through the sales and offers to sell infringing dairy goods to grocery stores and supermarkets in New York, New Jersey and

Pennsylvania.

91.     Given the manner by which Defendants undeniably obtained access to Plaintiff's

trademarks, their studious copying of Plaintiff's trademarks, their failure to cease any of the

infringing activities upon demand by Plaintiff, and their failure to take any remedial action to

repair the harm and damage caused by their conduct, Defendants' conduct of using Plaintiff's

trademarks to sell their own products was done willfully and in bad faith.

92.     As a result of Defendants' actions, Plaintiff is losing profits from lost sales,

suffering a loss of enormous goodwill, and will continue to suffer such loss if Defendants are

allowed to continue their illegal activity.

93.     As a result of Defendants' conduct, Plaintiff is entitled to damages in an amount

equal to three times Plaintiff's damages and/or Defendants' profits and reasonable attorneys' fees

and costs.

94.     In addition, Plaintiff has no adequate remedy at law for Defendants' ongoing

wrongful conduct. Plaintiff has been, and absent injunctive relief will continue to be, irreparably

harmed by Defendants' actions.

95.     Unless Defendants' unlawful actions as alleged herein are immediately enjoined,

Defendants will continue to cause damage to Plaintiff and its trademarks and Plaintiff will

continue to suffer irreparable harm and injury.

## THIRD COUNT FOR RELIEF
### (Tortious Interference Under New York Law)

96.     Plaintiff repeats and realleges each of the allegations of the foregoing paragraphs

as if fully set forth herein.

97.     Plaintiff has and had at all relevant times, business relationships with many retail

supermarkets and grocery stores in New York with which it is has contracted in the past and with

which it reasonably expected to contract in the future due to the custom in the dairy industry.

98.     Defendants have intentionally interfered and continue to intentionally interfere with and disrupt Plaintiff's business relationships with its customers in New York, New Jersey and Pennsylvania by converting Plaintiff's customers and attempting to convert Plaintiff's customers to their own through its infringement of Plaintiff's trademarks and false statements concerning the shutdown of Plaintiff's business due to the Covid 19 pandemic.

99.     Defendants' intentional and wrongful acts have actually and proximately caused a disruption of the economic and business relationship Plaintiff had with its retail supermarket and grocery store customers.

100.    As a direct and proximate cause of Defendant's improper and unlawful conduct, Nationwide has been damaged in an amount to be proven at trial, but in any event, no less than $100,000.00, plus costs and fees (including attorneys' fees), and interest in an amount to be determined by the Court.

## JURY DEMAND

101.    Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury in this action of all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment against Defendants as follows:

1.      Permanently enjoining and restraining Defendants, and their respective companies, subsidiaries, affiliates, divisions, officers, directors, principals, servants, employees, successors and assigns, and all those in active concert or participation with them from:

> (a)  imitating, copying or making unauthorized use of United States Trademark No. 6,236,837 (the "'837 Mark") and United States Trademark No. 4,198,589 (the "'589 Mark");

20

(b)   selling, offering for sale, advertising, promoting or displaying any products bearing any unauthorized reproduction, copy, counterfeit or colorable imitation of the '837 Mark and/or the '589 Mark, or any mark or design substantially indistinguishable from or confusingly similar to those trademarks;

(c)   using any unauthorized colorable imitation of the '837 Mark and/or the '589 Mark in connection with the promotion, advertisement, display, sale, and offering for sale of any products in such a manner as to relate or connect, or tend to relate or connect, such services of Defendants in any way with Plaintiff or to any products sold, sponsored, approved by, or connected with Plaintiff;

(d)   engaging in any other activity constituting an infringement of the '837 Mark and/or the '589 Mark, or of Plaintiff's rights in, or its right to use or exploit such trademarks, and the reputation and goodwill associated therewith;

(e)   making any statement or representation whatsoever, with respect to the infringing and counterfeit products at issue, that falsely designates the origin of the services as those associated with Plaintiff, or that is false or misleading with respect to Plaintiff;

(f)   making any statement disparaging Plaintiff's business; and

2.   Ordering Defendants to account for, and pay to Plaintiff, all profits realized by their wrongful acts and directing that such profits be trebled due to Defendants' willful actions;

3.   Awarding Plaintiff any lost profits not already captured by Defendants' profits;

4.   Awarding Plaintiff its costs and reasonable attorneys' and investigatory fees, expenses, costs, together with pre-judgment interest.

5.   Awarding Plaintiff other and further relief as the Court deems just and proper.

Dated:   June 28, 2021            Respectfully submitted,
         Brooklyn, New York

                                  *s/ Oleg A. Mestechkin*
                                  Oleg A. Mestechkin, Esq. (OM4108)
                                  Wing K. Chiu, Esq. (WC5637)
                                  Nancy Lam, Esq. (NL4630)
                                  **MESTECHKIN LAW GROUP P.C.**
                                  1733 Sheepshead Bay Road, Suite 29
                                  Brooklyn, New York 11235

Tel. (212) 256-1113
Fax. (646) 365-2069
om@lawmlg.com
wkc@lawmlg.com
nl@lawmlg.com

*Attorneys for Plaintiff Nationwide Dairy Inc.*

## VERIFICATION

I, **EDUARD MAGIDOV**, am over the age of 18 and am the Owner of Plaintiff,

**NATIONWIDE DAIRY INC.**, in this action. I have reviewed the allegations of the **VERIFIED**

**COMPLAINT** in this action and the documents annexed thereto, and attest that the allegations

set forth in the **VERIFIED COMPLAINT** are true and correct based on my personal knowledge

(unless otherwise indicated), and if called upon to testify as to their truthfulness, I would do so

competently. I declare under the penalties of perjury, under the laws of the United States, that the

foregoing statements are true and correct.

Executed on this ___28th___ day of June 2021.

**EDUARD MAGIDOV**

AARON MARGULIS
Notary Public, State of New York
Registration #01MA6378022
Qualified In Kings County
Commission Expires July 16, 2022

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 29, 2021, I served the foregoing document via electronic filing with the Clerk of the Court using the CM/ECF filing system.

                */s/ Nancy Lam*

Oleg A. Mestechkin (OM4108)
Wing K. Chiu, Esq. (WC5637)
Nancy Lam (NL4630)
**MESTECHKIN LAW GROUP P.C.**
1733 Sheepshead Bay Road, Suite 29
Brooklyn, NY 11235
Tel. (212) 256-1113
Fax. (646) 365-2069
om@lawmlg.com
wkc@lawmlg.com
nl@lawmlg.com

*Attorneys for Plaintiff Nationwide Dairy Inc.*